[No. 22984.  *En Banc.*  January 20, 1931.]

GEORGE A. GRANT, *Appellant,* v. DON H. EVANS *et al.,*
*Respondents.*[1]

*Robert M. Burgunder, Arthur M. Hare,* and *Ben A.
Maslan,* for appellant.

*Colvin & Rhodes,* for respondents.

[1] Reported in 295 Pac. 475.

PARKER, J.—The plaintiff, Grant, as auditor of King county and a taxpayer therein, seeks for himself, and all other taxpayers similarly situated, injunctive relief, restraining the defendants, as county commissioners of that county, from issuing $1,250,000 of the negotiable bonds of that county to aid in financing the establishing of a King county hospital. To that end, the plaintiff filed his complaint in the superior court for King county. The defendants responded thereto by demurrer, stating as grounds therefor that the complaint does not state facts constituting cause for such injunctive relief. The superior court sustained the demurrer, and the plaintiff electing not to plead further, final judgment of dismissal was rendered against him, from which he has appealed to this court.

The constitutional and statutory powers and limitations touching the incurring of indebtedness by counties, in so far as we deem it necessary to notice them, are the following: Section 6 of Art. VIII of our constitution reads,

"No county, . . . shall for any purpose become indebted in any manner to an amount exceeding one and one-half per centum of the taxable property in such county, . . . without the assent of three-fifths of the voters therein voting at an election to be held for that purpose, nor in cases requiring such assent shall the total indebtedness at any time exceed five per centum on the value of the taxable property therein, to be ascertained by the last assessment for state and county purposes previous to the incurring of such indebtedness, . . ."

Our present general statute authorizing counties to contract indebtedness and issue bonds therefor, was enacted in 1890. In so far as need be here noticed, referring to sections of Remington's Compiled Statutes, that statute reads:

"§ 5575. Each and every organized county of this

state, and each and every county that may hereafter be organized in this state, is hereby authorized and empowered by and through its board of county commissioners to contract indebtedness for general county purposes in any manner when they deem it advisable, not exceeding an amount, together with the existing indebtedness of such county, of one and one-half per centum of the taxable property in such county, to be ascertained by the last assessment for the state and county purposes previous to the incurring of such indebtedness.

"§ 5576. Each and every organized or hereafter to be organized county of this state may contract indebtedness for strictly county purposes in excess of the amount named in the last preceding section, but not exceeding in amount, together with the existing indebtedness, five per centum of the taxable property, to be ascertained as provided in the preceding section, whenever three-fifths of the voters of such county assent thereto, at an election to be held for that purpose, consistent with the general election laws, which election may be either a special or general election.

"§ 5577. Whenever any debt is incurred under the provisions of the first or second sections of this chapter (§§ 5575, 5576), or whenever the board of commissioners of any county shall submit to the voters of this county, at an election to be held under the provisions of the last preceding section, the question of issuing bonds to procure money for strictly county purposes, and three-fifths of the voters of such county having assented thereto, and the amount of said bonds, together with the already existing county indebtedness, not exceeding five per centum of the taxable property of said county, to be ascertained as provided in the last preceding section of this chapter, then the board of commissioners of such county is authorized and empowered to issue its negotiable bonds in the name of the county for the purposes for which such election was held."

Chapter 174 of the Laws of 1925, Ex. Ses., p. 483; Rem. 1927 Sup., §§ 6090-1 to 6090-7, in so far as need be here noticed, reads:

"AN ACT relating to and regulating the establishment, maintenance and operation of hospitals for the care of persons suffering from general diseases, by counties and counties and cities jointly.

"Be it enacted by the Legislature of the State of Washington:

"Section 1. The board of county commissioners of any county shall have the power to establish, provide and maintain alms houses and hospitals for the care and treatment of the indigent, sick, injured and maternity cases, and for this purpose said board of county commissioners shall have the following powers: To purchase or lease real property therefor or to use for this purpose lands already owned by the county providing such site shall first be approved by the state board of health; to erect all necessary buildings, make all necessary improvements and repairs and alter any existing building for the use of said hospitals: *Provided,* That such buildings be separate and apart from those designated as alms houses or county infirmaries: *Provided, further,* That the plans for such erection or alteration shall first be approved by the state board of health; to use county moneys, levy taxes and to issue bonds as authorized by law, to raise sufficient amount of money to cover the cost of procuring the site, constructing and operating hospitals and for the maintenance thereof and all other necessary and proper expenses herein authorized for shall be paid; to appoint a board of trustees for said hospital, as hereinafter provided, to accept and hold in trust for the county any grant of land, gift or bequest of money or any donation for the benefit of the purposes of this act, and apply same in accordance with the terms of the gift.

"Sec. 3. When it is proposed to establish in any county any such hospital, a petition shall be presented to the board of county commissioners, signed by three hundred or more resident taxpayers of such county, requesting said board to submit to the electors the proposition to issue bonds for the purpose of procuring a site, and erecting, equipping, and maintaining such hospital, and specifying the amount of bonds proposed to be issued for such purpose and the number of

hospital beds, which number shall not exceed one bed for each thousand population in counties of more than fifty thousand population.

"Sec. 4. Upon the presentation of such petition and the board of county commissioners unanimously so order, the board of county commissioners may submit to the voters of the county at the next general election the question of issuing bonds and levying a tax for such hospital.

"Sec. 5. Should a majority of all the votes cast upon the proposition at a general election be in favor of establishing such hospital, the board of county commissioners shall proceed to issue bonds of the county not to exceed the amount specified in said proposition, in denominations of not less than one hundred dollars nor more than one thousand dollars, drawing interest at a rate not to exceed six per cent per annum, payable annually or semi-annually. Said bonds shall be serial bonds finally maturing in twenty years from date of issuance.

"Sec. 6. If the hospital be established, the board of county commissioners, at the time of levying general taxes, shall levy a tax at the rate voted, not to exceed two mills in any one year for the maintenance of the hospital.

"Sec. 7. The county treasurer shall dispose of the bonds in the same manner as other county bonds, and the same shall not be sold for less than par with accrued interest."

The facts pleaded in the complaint which, it is asserted, show want of power in the board of county commissioners to issue the bonds here in question, we think are sufficiently summarized, for purposes of our present inquiry, as follows: On August 28, 1928, a petition, signed by more than three hundred resident taxpayers of King county, was presented to the board of county commissioners of that county, requesting the board to submit to the electors of that county a proposition to issue general negotiable bonds of King county, for the purpose of procuring a site and erecting and equipping

thereon a county hospital, in the amount of $2,750,000. That petition was in due form and signed by the requisite number of taxpayers, as prescribed by § 3 of the act of 1925. On September 17, 1928, the board of county commissioners duly passed and adopted its resolution No. 2923, reading as follows:

"RESOLUTION No. 2923

"WHEREAS, the Board of County Commissioners of King County, Washington, deem it advisable that King County shall for the following strictly county purposes, borrow the sum of $2,750,000.00 and issue the general negotiable bonds of said County therefor for the purpose of the constructing, equipping and acquiring a site for a King County Hospital,

"Now, THEREFORE, BE IT RESOLVED by the Board of County Commissioners of King County, Washington, as follows:

"Section 1. That at the general election to be held in King County on November 6, 1928, an election shall be held at which there shall be submitted to the qualified voters of said King County the following proposition which shall appear upon the ballot, as follows:

"Shall King County issue $2,750,000.00 of bonds for constructing, equipping and acquiring a site for a King County Hospital?

"Bonds      Yes  (  ),
"Bonds      No  (  )"

The resolution further specified the manner of issuing the bonds, as to denominations, numbers, times of maturity, etc., which, however, do not concern us here. On November 6, 1928, the proposition was duly submitted to the voters of the county at an election duly held on that day, the form of the ballot for voting at that election being as prescribed in the resolution No. 2923 of the board of county commissioners, above quoted. Thereafter, the vote was duly canvassed and made of record as follows:

"The Election Board of King County, State of Washington, being the Board designated by law as the Canvassing Board of the General Election held in King County on the 6th day of November, 1928, hereby certifies that at the said General Election the following resolutions received the requisite number of votes, as listed below, and thereby carried:

"RESOLUTION No. 2923.

"Shall King County issue $2,750,000.00 of bonds for constructing, equipping and acquiring a site for a King County Hospital?
"Bonds   Yes, 83,987
"Bonds   No, 12,383.''

Thus it is made to appear that more than three-fifths of the voters of the county voting at the election held for that purpose assented to the issuance of the $2,-750,000 of bonds as proposed and submitted to the voters. In due course, the board of county commissioners duly selected a site and adopted plans for the proposed hospital buildings, which were duly approved by the state board of health, as prescribed by § 1 of the act of 1925. Of the $2,750,000 of the bonds so authorized by the voters to be issued, $1,500,000 has already been issued and disposed of by the county commissioners. The board of county commissioners now proposes to issue and dispose of the balance of $1,250,000 of the bonds so authorized to be issued. The issue of the additional $1,250,000 of the bonds will make the indebtedness of King County, considering other indebtedness of the county properly chargeable to the one and one-half per cent constitutional debt limit, exceed that debt limit to the extent of approximately $185,000. The entire issuance of the $2,750,000 will still leave the county's indebtedness far within its constitutional debt limit which may be assented to by three-fifths of its voters.

There are here made in behalf of appellant, Grant,

as we understand his counsel, two principal contentions: (1) that the act of 1925 has the effect of limiting the debt which may be incurred for the financing of the establishing of a county hospital to one and one-half per cent of the assessed valuation of the taxable property of the county, though assented to by three-fifths of the voters; and (2) that, even, though such debt is not so limited by chapter 174, Laws of 1925, Ex. Ses., p. 483, to one and one-half per cent of the assessed valuation of the taxable property of the county, the further constitutional debt limit of three and one-half per cent additional has not been effectually assented to by the voters of the county, because the proposition was not submitted to the voters of the county with the express or implied intent, on the part of the board of county commissioners, or voted upon by the voters with intent, to express their assent to the incurring of the debt in excess of the one and one-half per cent debt limit.

We may concede, for present purposes, that §§ 3 and 5 of the act of 1925 have the effect of requiring the assent of a majority of the voters of the county to authorize the issuance of negotiable bonds of the county to finance the establishing of a county hospital, though we do not now so decide. However, it by no means follows that the board of county commissioners may not, under the act of 1925, read in the light of Rem. Comp. Stat., §§ 5575 and 5577, which it does not repeal, establish a county hospital without the issuance of negotiable bonds therefor, if the board is able to finance such establishing by other means which it may lawfully exercise. In § 1 of the act of 1925, boards of county commissioners are unqualifiedly, except as to approval of the state board of health, given very broad powers to that end, independent of issuing negotiable bonds to finance such establishing.

The only question required by that act to be submitted to the voters is stated in § 2 thereof as follows: "The question of issuing bonds and levying a tax for such hospital." In view of the taxing powers stated in § 1 of the act, and the general taxing power of the board of county commissioners, it seems to us that the words, "and levying a tax for such hospital" in § 4, mean only levying a tax for payment of the bonds which may be issued by authorization of the voters. We do not overlook the words of § 5 of the act,

"Should a majority of all of the votes cast upon the proposition at a general election be in favor of establishing such hospital, the board of county commissioners shall proceed to issue bonds, etc."

It seems to us that these words can mean nothing more than as if they read "in favor of issuing the bonds," instead of "in favor of establishing such hospital." For, plainly, nowhere in the act does it provide that the question of "establishing such hospital" is to be submitted to the voters. Manifestly, these words can only mean that, upon the issuance of the bonds being assented to by the voters, the board of county commissioners may proceed to issue the bonds. So we feel forced to the conclusion that the question of whether or not a hospital shall be established is not, by the act of 1925, to be, in terms, decided by the voters, but only the question of whether or not negotiable bonds of the county shall be issued to that end. Of course, if there be no other means of financing the establishing of a hospital available to the board of county commissioners, then a withholding of the assent of the voters to the issuance of bonds therefor would stand in the way of establishing such hospital.

Now, what is there in the language of the act of 1925 to indicate that there is therein expressed a legislative intent to limit the incurring of a debt for

the establishment of a county hospital, to one and one-half per cent of the assessed valuation of the taxable property of the county? It is argued in behalf of appellant that, since § 4 of the act of 1925 requires a majority vote authorizing the issuance of any bonds for that purpose, there is evidenced such legislative intent; because, under the constitutional limitation of indebtedness, a mere majority vote would be ineffectual, under any circumstances, to authorize the incurrence of indebtedness in excess of the one and one-half per cent constitutional limit. It seems to us that the majority vote, as expressed in § 5 of the act of 1925, is, at most, only a prerequisite to the exercise of the power by the board of county commissioners to issue negotiable bonds for the purpose of financing the establishing of a county hospital, and is not a limitation upon the power of the board of county commissioners, with the assent of three-fifths of the voters of the county, to incur indebtedness and issue bonds in excess of the one and one-half per cent constitutional limitation, and within the additional three and one-half per cent constitutional limitation, to finance the establishing of a county hospital. Clearly, the board of county commissioners, with such assent of the voters, may so incur county indebtedness in excess of the one and one-half per cent constitutional debt limit, and levy taxes therefor, by the plain terms of Rem. Comp. Stat., §§ 5575, 5576, 5577 and 5580. We are of the opinion that the act of 1925 does not limit the debt which may be created for the establishment of a county hospital, within the one and one-half per cent limit of indebtedness prescribed by the constitution, though we concede, for present purposes, that the board of county commissioners does not have the power to issue the negotiable bonds of the county for that purpose, even within the one and one-half per cent constitutional debt

limit, without being so authorized by a majority vote of the voters of the county.

Was the assent of three-fifths of the voters of the county to the issuance of these bonds an effective assent on their part that the debt might be incurred and the bonds issued therefor in excess of the one and one-half per cent constitutional debt limit? It is true that, in the resolution of the board of county commissioners, and in the ballot submitted to the voters for voting upon the proposition of issuing the bonds, there was not, in terms, any expressed intent of the board of county commissioners, or of the voters in voting upon the proposition, as to the proposed debt authorization being in excess of the one and one-half per cent constitutional debt limit. But, we think, it does not follow that the board of county commissioners did not, in fact, submit to the voters, and the voters did not in fact vote upon, the question of exceeding that debt limit. While such intention was not, in terms, expressed in the proposing resolution of the board of county commissioners, or in the form of ballot they submitted to the voters, it is apparent that the proposed debt exceeded the one and one-half per cent constitutional debt limit by some $185,000. Manifestly, it was intended that something more was asked of the voters than their assent to the mere issuance of the negotiable bonds of the county. We think, it fairly appears that there was asked of the voters their assent to the issuance of the bonds, and, also, their assent to the incurring of the indebtedness and the issuance of the bonds in excess of the one and one-half per cent constitutional debt limit.

In *Hazeltine v. Blake,* 26 Wash. 231, 66 Pac. 394, there was drawn in question a bond issue of the city of Olympia, submitted in this form: "Shall the city of Olympia for municipal purposes borrow $155,000,

and issue its negotiable bonds therefor?'' thus not in terms disclosing any intent to seek authority from the voters to exceed the constitutional one and one-half per cent debt limit. It was there held, in harmony with some previous expressions of the court, that, the city being then in debt to the extent that the proposed issuance of bonds could not be made, except by going over the one and one-half per cent debt limit, it must be presumed that the city council submitting the proposition, and the voters voting thereon, intended the proposed debt to exceed the one and one-half per cent constitutional debt limit. In so holding it was said:

''No assent of the voters is required by a municipality to enable it to incur a debt within the first limitation. This it may do without such assent, and it may cause such indebtedness to be evidenced by warrants drawn upon its treasurer, or by bonds issued pursuant to the requirements of the statutes. The assent of the voters is required only in cases where it is sought to incur a debt within the second limitation. Whenever, therefore, a municipality asks and obtains the assent of its voters to the incurring of a debt, the presumption arises from the very act itself that it is the intent to incur a debt within that limitation within which a debt can not be incurred without such assent; and, although this presumption is not conclusive in every instance, it must be so where it is not overcome either by an express declaration to the contrary or such a state of facts as will leave the question equally free from doubt.''

In *State ex rel. Clallam County v. Clausen,* 82 Wash. 137, 143 Pac. 876, we have a similar situation. In that case, there was drawn in question a proposal and submission to the voters as follows:

''Shall Clallam county through its board of county commissioners issue three hundred thousand ($300,-000) dollars in bonds to be used in building and improving roads and bridges?''

there being no expressed intention as to asking for, or authorizing, an exceeding of the one and one-half per cent constitutional debt limit. Following the holding in the *Hazeltine* case above noticed, it was again held that the presumption would be indulged that the board of county commissioners sought for, and received, the assent of three-fifths of the voters of the county to incur the indebtedness in excess of the one and one-half per cent limitation. Now, in the case before us, we have seen that, while we have assumed that it is necessary to have, at least, a majority vote of the voters to authorize the issuance of any bonds, it was manifestly necessary to receive the assent of three-fifths of the voters of the county, in order that the board of county commissioners have authority to issue the whole of the $2,750,000 in bonds, in view of the plain fact that it would carry the county's indebtedness over the one and one-half per cent constitutional debt limit into the additional three and one-half per cent constitutional debt limit, to the extent of some $185,000. In other words, the board of county commissioners was asking for authority not only to issue the bonds, but to issue them in an amount that necessarily required the assent of three-fifths of the voters of the county. We are of the opinion that the issuance of the bonds in excess of the one and one-half per cent constitutional debt limit was effectually assented to by three-fifths of the voters of the county, and thus gave to the board of county commissioners power to issue the whole of the $2,750,000 in bonds as proposed.

We conclude that the judgment denying to appellant the injunctive relief asked for must be affirmed. It is so ordered.

MITCHELL, HOLCOMB, BEALS, MAIN, BEELER, and MILLARD, JJ., concur.

TOLMAN, C. J., dissents.